[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I.
The Statewide Grievance Committee (hereinafter, the Committee) has filed this presentment seeking disciplinary action against Attorney Nitor V. Egbarin (hereinafter, the respondent) for violating Rule 8.4(3) of the Rules of Professional Conduct.[1] The alleged misconduct concerns misrepresentations and actions connected to the real estate closing for the purchase of Mr. Egbarin's former home in Bloomfield, Connecticut.
The presentment alleges that the respondent failed to inform the lenders of both his first mortgage, the Sanborn Corporation, and the second mortgage, the sellers, Claude J. and Pauline M. Picard, that he never paid his 1992 and 1993 federal taxes, and that Mr. Egbarin misstated information on the mortgage applications for the Sanborn Corporation.
The evidence indicates that Mr. Egbarin leased a home owned by Mr. and Mrs. Picard for approximately one year and ultimately arranged to purchase the home. Evidently Mr. Egbarin and his wife were to receive a credit of $30,000.00 for their rental payments against the purchase price of $330,000.00 and would seek a mortgage for the balance. All parties agree that the house appraised for only $300,000.00 and that the mortgage company would not lend more than $270,000.00. There is great disagreement as to whether the ultimate purchase price was $300,000.00 or $330,000.00. In order to secure the mortgage, the respondent provided the Sanbom Corporation with copies of both his 1992 and his 1993 tax returns and filled out certain loan applications, including both a preliminary and final document entitled "Uniform Residential Loan Application." In the first version dated March 25, 1994, the respondent checked a box marked "no" next to a question asking whether he was delinquent on any federal debt but also wrote "see file." In the final version dated May 31, 1994, the application had been prepared by Sanbom and that same box was marked "no" but with no explanatory notes. The respondent signed both applications individually and for his wife acting through a power of attorney.
At the hearing, Mr. Picard testified that he loaned the CT Page 7959 respondent $30,000.00 to make up the shortfall in the price and that he relied, among other things, on the 1993 and 1994 tax returns, the fact that the Egbarins drove luxury automobiles, and finally, the fact that they faithfully paid the rent. Mr. Picard's attorney also testified at the hearing about the details of the closing, the litigation that was instituted to collect the $30,000.00 note,[2] and the bankruptcy proceedings instituted by the respondent.[3] He indicated that the respondent told him that he did not file the tax returns. He further testified concerning a request for admissions in the collection suit to which the respondent failed to respond.[4] Mr. Picard's lawyer was extensively questioned about whether he or his client ever actually asked if the tax obligation had been paid. Finally, Mr. Egbarin testified concerning all of the above matters; his testimony will be discussed hereinafter.
 II. A.
"`An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession.'" [Doe v. StatewideGrievance Committee, 240 Conn. 671, 684-85, 694 A.2d 1218 (1997), quoting Massameno v. Statewide Grievance Committee, 234 Conn. 539,554-55, 663 A.2d 317 (1995).
 B.
The presentment alleges that the respondent has violated Rule 8.4(3) by both failing to disclose to the Sanborn Corporation and the Picards that although the tax returns were filed, the tax CT Page 7960 obligation was not paid and that Mr. Egbarin failed to properly disclose these debts on his loan application. The respondent argues not only that the proceedings below, that is before the Statewide Grievance Committee and its subcommittee, were procedurally flawed, but also that his conduct does not constitute a violation of Rule 8.4(3).
 1.
The respondent first argues that the Committee's reviewing subcommittee was improperly constituted as it was comprised of two persons as opposed to three persons. Practice Book § 2-35
(a) states in relevant part that "[u]pon receipt of the record from a grievance panel, the statewide grievance committee may assign the case to a reviewing committee which shall consist of at least three members of the statewide grievance committee, at least one third of whom are not attorneys." The Committee responds that if the panel was indeed improperly constituted, the respondent should have addressed this issue in that proceeding. It argues that having failed to do so, the respondent has waived its right to now object citing Dragan v. Connecticut MedicalExamining Board, 223 Conn. 618, 629, 613 A.2d 739 (1992). In that case, the court held that "[a] party to an administrative proceeding cannot be allowed to participate fully at hearings and then, on appeal, raise claims that were not asserted before the board." Id., 632. The respondent did not present any evidence at the hearing before this court that the proceedings below were improper.
The Committee additionally argues that our Supreme Court has, in Lewis v. Statewide Grievance Committee, 235 Conn. 693, 707,669 A.2d 1202, (1996), approved the use of a two person board. In rejecting a similar claim, the court held that a quorum of two persons was acceptable to hear a matter "although a majority vote is needed for a proposed decision". While this court received in evidence a copy of the transcript before the reviewing committee, it did not receive any evidence of what took place thereafter (i.e. final decision, etc.). It does not know whether two or three people signed the decision; hence, this court cannot possibly say that the actions below were improper. Finally, the Committee has referred this court to Hanson v. StatewideGrievance Committee, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 560411 (January 30, 1997, McWeeny, J.), in which Judge McWeeny, following Lewis, rejected a similar claim and was later upheld by the Appellate CT Page 7961 Court, Hanson v. Statewide Grievance Committee, 47 Conn. App. 936,707 A.2d 1293 (1998). The first argument is rejected.
 2.
The respondent's second argument is that his conduct did not violate Rule 8.4(3). The Committee alleges that the respondent committed fraud in failing to disclose to Sanborn that he had not paid the taxes. "`"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed."'" Alexander v.Church, 53 Conn. 561, 562, 4 A. 103 (1886), quoting T. Cooley, Torts p. 474. The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." Billingtonv. Billington, 220 Conn. 212, 217, 595 A.2d 1377 (1991), citingMaturo v. Gerard, 196 Conn. 584, 587, 494 A.2d 1199 (1985);Miller v. Appleby, 183 Conn. 51, 54-55, 438 A.2d 811 (1981).
The respondent testified that no one ever asked whether the taxes had been paid and that he never said that they had been paid. He, unfortunately, misses the point. This is not an instance of a simple non-disclosure; see Watertown Savings Bankv. Mattoon, 78 Conn. 388, 393, 62 A. 622 (1905); rather it is a case of nondisclosure under circumstances where there is a duty to speak. See Bernard v. Gershman, 18 Conn. App. 652, 656,559 A.2d 1171 (1989). Certainly a giant part of the mortgage application process is directed to whether the applicant can afford to repay the loan. It is elementary that the lender needs to know whether the applicant has any outstanding debts which might interfere with the security of the loan. The tax returns were supplied knowing that Sanborn would rely on them, and they were, indeed, false representations of statements of fact. They were also untrue and were made to induce the loan, and Sanborn did act on them to its injury.
The failure to disclose that the taxes were not paid on the residential loan applications is likewise a violation. Unlike the first argument which posits that there was no affirmative act, the applications did ask for this information. Mr. Egbarin's comment that he had disclosed information about certain outstanding student loans, and hence the reference to "see file" in the first application, is simply not relevant. His argument CT Page 7962 that the bank prepared the second application and that therefore the bank already knew the information also fails. He never told Sanborn or the Picards that he never paid the stated tax obligation.
Unfortunately there is more. At the hearing, Mr. Egbarin was less than forthright in his testimony concerning his taxes. He stated that he had his tax preparer file the taxes; yet when asked about the payment, $26,210.00 on taxable income of $80,703.00 for 1992 and $31,389.00 on taxable income of $103,700.00 for 1993, he said "they are not paid in full because of an arrangement with the I.R.S." In fact, when this court asked for specifics, the respondent was unable to provide y information; he was unable to recall whether he had paid anything, whether other taxes were overdue or what his total tax liability was with the I.R.S. As to whether this failure to pay should have been listed in the application, he stated that "he had never failed to pay a tax return . . . due to his arrangement." When asked as to whether he had made any payments on his 1994 return, he stated that the amounts were not paid in full but rather were part of the entire tax liability. Mr. Egbarin not only misrepresented relevant facts to the Sanborn Corporation, he misrepresented those same facts to this court.
 3.
Much of the testimony at the hearings concerned the second mortgage from the respondent and his wife to Mr. and Mrs. Picard. What should be fairly simple is fraught with confusion and untruths. All parties agree that the respondent signed a $30,000.00 mortgage note and deed in favor of Mr. and Mrs. Picard and all parties agree that the note was not paid and that the Picards brought suit to collect the moines.
In his brief, Mr. Egbarin states that "the Picards were adamant that the house was worth $330,000.00, so the parties surreptitiously agreed that despite Attorney Egbarin being credited with $30,000.00 from his lease payments, he would have to take out a second mortgage from the Picards for $30,000.00." At the closing argument in this case, the respondent's attorney stated that the note was signed because Mr. Egbarin wanted to stay in the house but that he did not really need to sign the note because the purchase price was really $300,000.00. He further stated that the note was "recklessly signed." Of interest to this court is that the HUD settlement statement does not refer CT Page 7963 to this mortgage and note at all. Additionally, according to that settlement statement, both the sellers and the buyers had personal representation.
As noted, the Picards commenced suit as a result of the respondent's failure to pay the monies due on the note. The first case was a foreclosure action, CV95-0548380, filed in Hartford. After the respondent filed special defenses and a counterclaim, it was transferred to New Britain to be consolidated with a subsequent suit (CV96-0471339) also commenced by the Picards. In seeking to transfer this case to New Britain, the Picards withdrew their request for foreclosure of the property, noting that the issues in the New Britain case were the same as those pending in Hartford. That motion was subsequently granted, but the court, Shortall, J., severed this case from the pending New Britain case. Ultimately the court, Shortall, J., entered a nonsuit against the Picards for their failure to appear at trial on January 5, 1999.
The second case, the New Britain case, was a suit only on the note and commenced with a request for a "garnishment" of the property. On March 4, 1996, the court, Handy, J., granted the request in the amount of $35,000.00. After a series of hearings on disclosure matters, contempt issues, recusal issues and motions to reduce or vacate the garnishment, summary judgment was granted in favor of the Picards on July 2, 1998. It is interesting to note that in his affidavit on the motion for summary judgment, Mr. Picard states that the premises were sold for $300,000.00 with $270,000.00 from the Sanborn loan and $30,000.00 from the Picard loan. There is no mention of the $30,000.00 lease payment credit or a purchase price of $330,000.00. On November 4, 1998, the court, Kremski, J., entered judgment, after a hearing in damages, in favor of the Picards against the respondent and his wife in the sum of $33,544.00, plus attorney fees of $5,000.00, plus court costs. The file does not reflect any appeal.
In moving for summary judgment, the Picards relied, in part, on the request for admissions, dated March 25, 1997, which the respondent failed to answer and thus the statements therein were deemed to be admitted. See Practice Book § 13-23. Those requests included statements that the respondent failed to file his income taxes for the years 1991-93 on or before May 31, 1994, and that the respondent provided a copy of his tax returns for 1991-93 to the Picards and Sanborn prior to the closing. Copies CT Page 7964 of those pleadings were introduced at the presentment hearing by the Committee, with no objection.[5]
It is clear to this court, based on the testimony at the hearings, the documents submitted into evidence, the conclusive effect of the decision in the New Britain collection case discussed above; see Krondes v. Norwalk Saving Society,53 Conn. App. 102, 119 A.2d ___ (1999); that the Committee has met its burden of proof by clear and convincing evidence. Indeed, the testimony may have actually revealed additional violations of Rule 8.4(3).[6]
 C.
While they have not been officially adopted as rules by the Judges of the Superior Court, the American Bar Association's Standards for Imposing Lawyer Sanctions have frequently been utilized in determining the appropriate discipline. Our Supreme Court recently noted their usefulness in Statewide GrievanceCommittee v. Spirer, 247 Conn. 762, 782 ___A.2d (1999); see alsoStatewide Grievance Committee v. Shluger, 230 Conn. 668, 673
n. 10, 646 A.2d 781 (1994). Section 3.0 of the Standards state that "[i]n imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the lawyer's mental state; and (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." At § 9.0 the Standards state that "[a]fter misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose."[7]
Turning to the aggravating factors first, it appears that a number apply in this case. This court was advised that there are pending grievances against the respondent in which probable cause has been found and it is clear that the misrepresentation evidences a selfish motive. There is no apparent pattern of misconduct unless one construes the failure to disclose on the multiple occasions as a pattern. There are, of course, multiple offenses and while this court does not believe that the respondent engaged in a bad faith obstruction of the disciplinary proceeding, it does believe that false statements were made. It is both clear and very disconcerting that the respondent has refused to acknowledge the wrongful nature of the conduct. Both the institutional bank as well as the Picards were victims in this case even if the closing did not reflect the true nature of CT Page 7965 this real estate transaction. The respondent has been a member of the bar since 1987. This case, of course, does not involve an attorney who has misappropriated funds from a client; yet, it still involves the issue of restitution and Mr. Egbarin has surely not paid any monies. The last factor concerns illegal conduct and this court has already discussed this issue in terms of the nondisclosure and the payment of taxes.
In terms of mitigating factors, there is no evidence of a prior disciplinary record, although this court was advised of pending matters. At the closing argument, the respondent's attorney stated that his client had never been charged with the failure to file or pay taxes. Moreover, he stressed that any misrepresentation was passive and that his client was not indifferent to restitution as this was a "phantom loan" and an undeserved judgment. He indicated that his client had suffered financially as a result of the attachment. He stated that his client lost his luxury cars as well as his prestigious home and that his children had to now attend public schools. Additionally, he stressed that his client had brought embarrassment to the Bar. Essentially, he has argued that his client has been penalized enough through this loss of reputation and the imposition of the judgment.
As indicated above, a simple home purchase evolved into an unmitigated disaster. While there are certainly a number of issues concerning the closing, they do not excuse the initial actions taken by the respondent. The Commentary to Rule 8.4 is instructive:
 Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offense carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice or law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation. CT Page 7966
The respondent violated Rule 8.4(3) by engaging in conduct that involved dishonesty, fraud, deceit and misrepresentation. As noted by the court in Statewide Grievance Committee v. Shluger, supra, 230 Conn. 679, "[w]e have a continuing duty to make it entirely clear that the standards of conduct, nonprofessional as well as professional, of the members of the profession of the law in Connecticut have not changed, and that those standards will be applied under our rules of law. . . ." (Internal quotation marks omitted). Those standards require that attorneys be honest and forthright. Moreover, the Preamble to the Rules of Professional Conduct states, "[a] lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs." (Emphasis added). Certainly these principles apply to the financial aspects of a real estate closing. The respondent has woefully failed to meet these standards. In this case he has fraudulently misrepresented relevant facts to his mortgage lender and to the seller of his former home. He has failed to pay his taxes and he has been less than honest and forthright with this court. Accordingly, it is the decision of this court that the respondent be suspended from the practice of law for a period of five years. Readmission will be subject to Practice Book § 2-53 and the respondent will be required to submit evidence of the successful completion of a bar approved course on legal ethics.
Berger, J.